IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | CRIMINAL ACTION 1:11-00122-KD-C |
| ) | |
| PEDRO LAMELA-CARDENAS, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

This action is before the Court on the defendant Pedro Lamela-Cardenas' Motion to Suppress (Doc. 34) and the response in opposition filed by the Government (Doc. 39). An evidentiary hearing with oral argument was held on July 1, 2011, and the parties have submitted additional briefing in the matter pursuant to the Court's oral order at the hearing (Docs. 48, 52). Upon consideration of the motion, response, supplemental briefing and evidence presented at the hearing, and for the reasons set forth herein, Pedro Lamela-Cardenas' Motion to Suppress (Doc. 34) is due to be **DENIED**.

I.     Finding of Fact

Joshua Rhodes ("Rhodes") is a deputy with the Mobile County Sheriff's office who has served as such for two-and-a-half or three years. (Suppression Hearing Transcript ("SHT"), p. 3). As a sheriff's deputy, his duties include interstate interdiction, which involves attempting to catch criminals traveling on the interstate with contraband. (Id., pp. 4-5). Previously, Rhodes worked for three years with the City of Mobile police department, during which he participated in "hundreds or thousands" of traffic stops. (Id., pp. 3-4).

On May 6, 2011, Rhodes, who was traveling alone in his marked patrol car on Interstate 10, came upon a red GMC Sierra towing a white Hyundai. (Id., pp. 5, 8, 38; Gov't's Exh. C). Rhodes observed that the Sierra was following too closely to the vehicle in front of it. (SHT, p. 5). He

1

pulled up behind the Sierra, ran its tag and found it was registered to the vehicle, indicating it was not stolen. (Id., pp. 5-6, 60). During the five to ten seconds it took for Rhodes to run the tag, the Sierra continued to follow too closely, at a distance estimated by Rhodes to be around forty feet, maintaining the same speed as the car it was following. (Id., pp. 60-62).

Pursuant to Alabama Code § 32-5A-89, which makes it a traffic violation for a driver to follow a vehicle too closely, (Gov't's Exh. B), Rhodes stopped the Sierra. To avoid the danger posed by oncoming interstate traffic, Rhodes approached the Sierra on the passenger side. (SHT, pp. 7-8). At the time of the stop, Rhodes was in uniform and carrying a gun. (Id., pp. 37-38). The windows of the vehicle were down, and Rhodes noted that it was occupied by two males: Defendants Pedro Lamela-Cardenas ("Lamela"), who was the driver of the vehicle, and Javier Ramon Rodriguez ("Rodriguez"). (Id., pp. 8-9). Lamela is a native of Cuba who lives in Miami, Florida, and claims not to speak English. (Id., pp. 156-57).

Upon approaching the vehicle, Rhodes first noticed that Rodriguez was acting very nervous. (Id., p. 9). Rhodes "could literally see his heart beating in his chest through his clothes and his neck[,]" and he was shaking. (Id., pp. 9-10). To Rhodes, Rodriguez appeared more nervous than was normal for the circumstances. (Id., p. 10). Rhodes asked both men for their identification. (Id.). At all times relevant to this matter, Rhodes verbally addressed Lamela and Rodriguez in English, as he does not speak Spanish. (Id. at pp. 10, 16, 25, 44-45). Both men complied without any indication that they didn't understand. (Id., pp. 10-11). Lamela claims, however, that he already had his license in hand before Rhodes asked for it. (Id., p. 174).

Rodriguez had taken his identification out of his wallet, which Rhodes observed him retrieve from his back pocket. (Id., pp. 12-13, 53-54). After handing Rhodes his identification, Rodriguez set his wallet down on the Sierra's center console. (Id., p. 13, 54). Rodriguez continued to act nervous, so Rhodes asked him to step out of the car. (Id., p. 13). Rodriguez complied, again

2

without hesitation, though he appeared "[a] little scared, a little angry" with the request. (Id., pp. 13-14). At this point, Deputy Richard Sorrell ("Sorrell"), who had been following behind Rhodes when he made the stop, had pulled up behind Rhodes' vehicle and was approaching the scene. (Id., pp. 14, 81, 95). Rhodes had Sorrell take Rodriguez back to his vehicle, in order to separate the two men for safety reasons. (Id., pp. 14-15). While with Sorrell, Rodriguez stood with his back to Rhodes and the Sierra and did not see or hear Rhodes' further interaction with Lamela. (Id., pp. 15, 56).

Rhodes then asked Lamela, the driver, from where he was coming and where he was going. (Id., pp. 15-16). Appearing to understand Rhodes, Lamela responded in broken English that he was coming from Louisiana and was going to Florida. (Id., pp. 15-16). The two men had gone to Louisiana to tow a car they were had purchased. (Id., p. 158). Rhodes then asked Lamela for permission to search the vehicle, moving his arms in a circular motion inside the vehicle to indicate the area he wished to search. (Id., pp. 16-17). At this point, about a minute or two had passed since Rhodes had pulled the Sierra over. (Id., pp. 24-25). Lamela acted like he did not understand the request, so Rhodes produced a copy of Spanish for Law Enforcement from his pocket. (Id., p. 17). Turning to page 205 of the book, Rhodes pointed out to Lamela the last two lines on the page, the first line containing the phrase "May I search your car?" and the second line containing its Spanish equivalent, "¿Me da permiso para registrar su coche?" (Id., pp. 18-20; Gov't's Exh. D). Because Lamela was still in the driver's seat, and because Rhodes was still standing on the passenger side, Rhodes had to reach through the open passenger door and across the interior of the Sierra to show Lamela the page. (SHT, pp. 46-47). After being shown the page, Lamela then said yes. (SHT, p. 20).

Upon commencing his search, Rhodes first turned his attention to the wallet Rodriguez had left on the center console, as he felt that Rodriguez might have been trying to hide something by

3

leaving it there. (Id., pp. 20-21, 63-64). In the wallet, Rhodes found a Louisiana identification card that had a picture of Rodriguez on it but was in the name of "Josh Johnson." (Id., pp. 72-73; Doc. 34-1 at 2). After searching the wallet, Rhodes searched the center console of the vehicle, where he found a bundle of credit cards and gift cards hidden under the cup holder, some of which were in the name of "Josh Johnson." (SHT, pp. 22, 72-73, 177; Doc. 34-1 at 2). Rhodes then searched a gym bag behind the passenger seat, in which he found a jacket which contained several more cards, all also in the name of "Josh Johnson." (SHT, pp. 23, 46, 74). After searching the jacket, Rhodes ceased searching the Sierra further at that time. (Id., p. 23). Throughout the search conducted on the side of the interstate, Lamela remained in the Sierra and never indicated that he wished the search to stop. (Id., pp. 20, 22-24, 180). In addition, Rhodes was never made aware of who owned the gym bag, and the only identification found in it was the cards in the name of "Josh Johnson." (Id., pp. 58-59).

Rhodes then asked Lamela to follow him to a substation in Theodore. (Id., p. 25, 106). In English and without hesitation, Lamela said okay. (Id.). Lamela followed Rhodes to the substation. (Id., p. 26). Sorrell brought up the rear, carrying Rodriguez in his vehicle. (Id.). Before they left for the substation, Rhodes signaled Sorrell to handcuff Rodriguez for safety reasons. (Id., pp. 27-28, 84). Sorrell complied with the order. (Id., pp. 84, 98). At this point, neither Lamela nor Rodriguez had been placed under arrest by the deputies. (Id., p. 28).

The deputies and the two defendants arrived at the substation without incident, and the defendants were brought inside. (Id., pp. 29-30). Rhodes printed and filled out two forms asking permission to search a vehicle, one for the Sierra and one for the Hyundai being towed. (Id., p. 30). Rhodes explained the permission forms to Lamela, who appeared to understand them and signed both, though he claims he thought the forms were for permission to move his car. (Id., pp. 30-31, 183-84; Gov't's Exh. A). Rhodes proceeded to conduct a further search of the two vehicles on the

4

premises. (SHT, p. 32). The search of the Sierra by Rhodes and another deputy yielded a number of other credit and gift cards hidden beneath the dashboard and under the carpet, on both the driver and passenger sides. (Id., pp. 75-78, 127-28).

Chris Graham ("Graham"), a United States Secret Service agent, was called to the substation and brought a card-reading device with him. (Id., pp. 120-21). Graham used the device to scan the magnetic strips of the credit cards to see what was on them. (Id., p. 121). Graham estimates he examined forty or more credit cards. (Id., p. 122). Some of the credit cards had nothing encoded on them, some had encoded information that matched the numbers embossed on them, and some were encoded with numbers different from those embossed on them. (Id.). Each credit card was also embossed with the name of either "Josh Johnson," "Javier Rodriguez," and "Pedro Lamela-Cardenas." (Id., pp. 122-23). Graham concluded that a majority of the credit cards were counterfeit. (Id., p. 123). Graham was also presented with fifty or more gift cards. (Id., p. 125). After examining the cards, Graham interviewed Lamela using a Spanish-speaking ICE agent, asking him about what was found in the Sierra. (Id., pp. 134-36). The ICE agent would wait until Graham had finished speaking to translate his words, though Lamela would nod his head while Graham was still speaking English. (Id., pp. 135-36). Lamela, however, remained silent during Graham's questioning. (Id., p. 183).

Upon arriving at the substation, Sorrell sat Rodriguez at a conference table in the substation, then placed him in a cell about fifteen minutes later. ((Id., pp. 84-85). About forty-five minutes later, Sorrell and Immigration and Customs Enforcement (ICE) Agent Matthew Chakwin ("Chakwin") retrieved Rodriguez and sat him back at a table, where Chakwin introduced himself, said he wanted to talk with him, and read him his Miranda rights from a form waiver. (Id., pp. 85-87, 108-09; Gov't's Exh. 1). Chakwin asked Rodriguez to sign the waiver. (SHT, p. 111). Rodriguez said he did not want to sign the Miranda form but told Chakwin he would talk with him.

(Id., p. 110). Chakwin reiterated that he had read Rodriguez his Miranda rights and asked him if he wanted to answer his questions. (Id., p. 111). Rodriguez responded that he did not have a problem with talking to Chakwin. (Id.).

Chakwin then proceeded to question Rodriguez for about ten to twenty minutes, with Rodriguez willingly providing responses. (Id., pp. 91-92, 111). Rodriguez was then returned to his cell. (Id., p. 92). Rodriguez was removed from his cell and questioned by Chakwin twice more after that. (Id., pp. 92-93, 112-16). In all, the questioning spanned a period of about an hour and a half. (Id., p. 94). Whenever questioned about the cards found in the Sierra, Rodriguez denied having any knowledge of them. (Id., pp. 117-18) Rodriguez never indicated to the officers during questioning that he did not wish to talk to them, and no coercion was used to get him to talk. (Id., pp. 93-94, 114, 116).

After the search at the substation, Rhodes issued Lamela a citation, about an hour and a half having passed since the initial stop. (SHT, pp. 32, 62; Gov't's Exh. C). The citation was translated to Lamela in Spanish and he signed it. (Id., pp. 185-86). Both defendants were then placed under arrest for trafficking in stolen identities and criminal possession of a forged instrument. (SHT, pp. 35-36). It is the policy of the Mobile County Sheriff's office to conduct an inventory search of vehicles upon impound. (Id., p. 35).

Lamela denies he conversed with Rhodes in English, that he understood Rhodes' request for permission to search his vehicle, or that he gave consent to search the vehicle. (Id., pp. 161-62, 175-76). He also claims that Rhodes never showed him a book during the stop. (Id., p. 164). When shown the page Rhodes claimed he had pointed out to him, Lamela claimed that the Spanish phrase asking for permission to search his car was incorrect but that he could understand what was requested. (Id., p. 167; Gov't's Exh. D).

II.   Arguments

Lamela moves to suppress evidence seized as a result of an alleged illegal traffic stop and unlawful detention. Lamela argues that the traffic stop was illegal because there was no traffic violation and thus no reasonable suspicion to believe that Lamela was violating a traffic law, but instead the stop was made because Lamela is Hispanic. Lamela argues that even if a traffic violation did occur, under the totality of circumstances, Rhodes can point to no facts or inferences from those facts to support a reasonable suspicion of criminal activity to support Lamela's continued detention after the stop. Lamela also argues that he did not voluntarily consent to the warrantless search of the vehicle, the wallet, or the luggage because he was unable to speak, read or write in English. (Doc. 34).

The Government responds that Lamela was legally stopped for violation of an Alabama traffic statute. The Government argues that based on the totality of the circumstances, Lamela gave a voluntary verbal consent to the search of his vehicle, primarily because Rhodes conversed with Lamela in English before obtaining Lamela's consent. The United States points out that Rhodes showed Lamela a page from the book *Spanish for Law Enforcement* wherein the Spanish translation for "May I search your car?" was found and that Lamela answered "Yes" to the question. The United States also argues that the traffic stop took approximately three to five minutes and that once voluntary consent to search was obtained, the investigatory detention became a consensual encounter. (Docs. 39, 48).

III.  Analysis

    A.  *The initial traffic stop*

"A traffic stop [] is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with Terry[ v. Ohio], 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889[ (1968)]." United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008). Moreover,

7

> "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996); United States v. Holloman, 113 F.3d 192, 194 (11th Cir. 1997) (stating that Whren "squarely rejected the pretextual stop analysis" and that an officer's "ulterior motives" for a stop are not relevant so long as it is justified by probable cause).

United States v. Boyd, 388 F. App'x 943, 947 (11th Cir. 2010).

Rhodes' initial stop of Lamela's vehicle was based on his observation that Lamela was following a vehicle too closely in violation of Ala. Code § 32-5A-89, which reads in pertinent part:

> (a) The driver of a motor vehicle shall not follow another more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway. Except when overtaking and passing another vehicle, the driver of a vehicle shall leave a distance of at least 20 feet for each 10 miles per hour of speed between the vehicle that he is driving and the vehicle that he is following.

Rhodes estimated that Lamela was following the vehicle in front of him at a distance of forty feet and that he made no effort to pass the leading vehicle during the time it took Rhodes to run his tag. (SHT, pp. 60-61). Even if Lamela is to be believed that he was only traveling sixty miles per hour, (Id., p. 159), he would have still been in clear violation of the statute. Evidence also shows that Rhodes regularly stops motorists for this offense. (Id., pp. 34-35; Defendant Lamela's Exh. 4).

Lamela claims that there was no one in front of him on the interstate when Rhodes first began following him, and that Rhodes passed by him once before pulling onto the side of the road and waiting for Lamela to pass him again. However, based on the evidence presented, the Court finds Rhodes' testimony of the events leading up to the traffic stop to be credible and that he had probable cause to believe that Lamela had committed a traffic violation at the time he pulled him over. Therefore, the traffic stop was reasonable and not in violation of the Fourth Amendment.

    B.    *Validity of Lamela's consent to search*

> An officer conducting a routine traffic stop may request consent to search the vehicle. Schneckloth v. Bustamonte, 412 U.S. 218, 222, 36 L. Ed. 2d 854, 93 S. Ct.

8

> 2041 (1973); Simmons, 172 F.3d at 778. A consensual search is constitutional if it is voluntary; if it is the product of an "essentially free and unconstrained choice." Schneckloth, 412 U.S. at 225. See also Hudson v. J.T. Hall, 231 F.3d 1289, 1296 (11th Cir. 2000) (citing United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989)). In assessing voluntariness, the inquiry is factual and depends on the totality of the circumstances. Schneckloth, 412 U.S. at 248-49, 93 S. Ct. 2041. A district court's determination that consent was voluntary is a finding of fact, that will not be disturbed on appeal absent clear error. Garcia, 890 F.2d at 359 (where voluntariness determined from conflicting testimony, district court's finding affirmed absent clear error).
>
> In evaluating the totality of the circumstances underlying consent, the court should look at several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found. Hudson, id.; see also [United States v. ]Shabazz, 993 F.2d [431,] 438[ (5th Cir. 1993)].

United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001).

"The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily . . . [D]etermining whether consent was voluntary is not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis." United States v. Acosta, 363 F.3d 1141, 1151 (11th Cir. 2004) (internal quotations omitted).  Lamela claims that he does not understand English and that Rhodes never asked for his permission to search his car while on the side of the interstate, whether by showing him the phrase in Spanish for Law Enforcement or otherwise.  In his cross-examination of Rhodes, Lamela also pointed out that Rhodes' book and its type are rather small and that there were multiple Spanish and English phrases written on the page Rhodes indicated to him in seeking permission to search.  Rhodes admitted that he had to reach across the interior of the Sierra from the passenger-side door to show Lamela the book.  Finally, Lamela testified that he allowed Rhodes to search his own wallet because "[h]e's a policeman . . . The policeman has the authority . . . I couldn't avoid it . . . He asked me for it." (SHT, pp. 162-63).

9

However, the Court finds credible Rhodes' testimony that Lamela gave verbal consent to a search of his vehicle after Rhodes pointed him to the Spanish phrase asking for such permission in Spanish for Law Enforcement. Lamela stated at the suppression hearing that he could understand the phrase as written to be asking permission to search a vehicle. Lamela has not claimed that Rhodes threatened or otherwise coerced him at any time during the stop and search on the side of the interstate, and Lamela did not object in any way to Rhodes' actions during the entirety of his search. As such, under the totality of the circumstances, the Court finds that Rhodes had valid consent to search the Sierra during the traffic stop.

C.    *Length of the stop & detention*

The Eleventh Circuit has held:

> Because traffic stops are seizures within the meaning of the Fourth Amendment, "an officer's actions during a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place" and "the duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop." United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (quotation marks and citations omitted). A law enforcement officer conducting a traffic stop may prolong a traffic stop "to investigate the driver's license and the vehicle registration . . . by requesting a computer check" and to await "the results of a criminal history check that is part of the officer's routine traffic investigation." United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (quotation marks, citations, and footnote omitted); see also United States v. Hernandez, 418 F.3d 1206, 1209 n.3 (11th Cir. 2005) (stating that the officer may ask questions — even those unrelated to the initial purpose of the stop — so long as the questioning "does not prolong the time reasonably required to complete that initial mission") (quotation marks, alterations, and citation omitted). "Ordinarily, when a citation or warning has been issued and all record checks have been completed and come back clean, the legitimate investigative purpose of the traffic stop is fulfilled." United States v. Simms, 385 F.3d 1347, 1353 (11th Cir. 2004); see also Boyce, 351 F.3d at 1107 (stating that once officer "had completed writing the warning citation and returned Boyce's license . . . the traffic violation investigation was complete and . . . Boyce was free to go"). Where, however, an officer has "an objectively reasonable and articulable suspicion that illegal activity ha[s] occurred or [i]s occurring," he may extend the duration of the stop for further investigation. United States v. Spoerke, 568 F.3d 1236, 1248-49 (11th Cir. 2009). "When making a determination of reasonable suspicion, we must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." Simms, 385 F.3d at 1354 (quotation marks and citation omitted). Reasonable suspicion to justify an extended investigatory detention

10

thus requires more than "an inchoate and unparticularized suspicion or hunch of criminal activity." Id. (quotation marks and citation omitted).

United States v. Sampson, 388 F. App'x 950, 952-53 (11th Cir. 2010).

In addition, "[a]n officer's prolonging of a traffic stop beyond its initial purpose is []reasonable . . . if the driver consents." United States v. Packer, 375 F. App'x 976, 978 (11th Cir. 2010) (citing United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999)).  The duration between the initial stop and Rhodes' obtaining Lamela's consent to search the Sierra was brief.  While checking both men's identification upon approaching the stopped vehicle, Rhodes noticed that Rodriguez was acting nervous and decided to have him exit the car, which was a reasonable precaution.  See United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009) ("During a lawful traffic stop, officers also may take steps that are reasonably necessary to protect their personal safety, including requiring the driver and passengers to exit the vehicle as a matter of course." (internal citation and quotations omitted)).

After turning Rodriguez over to Sorrell, Rhodes asked Lamela from where he was going and coming, then asked for permission to search his vehicle, which Lamela gave after Rhodes showed him a Spanish phrase asking such permission.  Lamela agrees that he can understand the Spanish phrase as asking for such permission, though he disputes that Rhodes ever showed it to him at the traffic stop.  At the time consent was obtained, only a minute or two had passed since the initial stop occurred, and Rhodes had not even begun to write up a citation or warning.      Lamela has devoted considerable energy to determining the exact timeline of the stop by introducing GPS logs for the police vehicles involved and recordings of communication between the deputies and dispatch.  However, once Lamela gave Rhodes consent to search his vehicle, he also provided consent to prolong the traffic stop.  See United States v. Ubaldo-Viezca, 398 F. App'x 573, 581 (11th Cir. 2010) ("Barnes asked Garcia for consent to search her vehicle, which Garcia granted. At this point, the stop transformed into a consensual encounter.").  When Rhodes found the Louisiana

11

identification in the name of "Josh Johnson" but with Rodriguez's picture on it, along with credit cards also in the name of "Josh Johnson," Rhodes had probable cause to believe that criminal activity was occurring, justifying the seizure of the items in the car for purposes of investigation and interrogation. United States v. Virden, 488 F.3d 1317, 1321 (11th Cir. 2007) ("However, the search and seizure of vehicles without a warrant is permissible when the police have probable cause to believe a vehicle contains contraband.") Accordingly, the items seized were pursuant to a valid search and are not subject to suppression as to defendant Lamela.

IV.     Conclusion

For these reasons, it is **ORDERED** that Lamela's Motion to Suppress (Doc. 34) is **DENIED**.

**DONE** and **ORDERED** this the **10th** day of **August 2011**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**